# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

MEGAN WINIFRED ROACH,

                    Plaintiff,

     v.                                5:12-CV-992

                                       (GLS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

KAREN S. SOUTHWICK, ESQ., for Plaintiff
PETER W. JEWETT, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

    This matter was referred to me for report and recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

    Plaintiff "protectively filed"[1] applications for both Social Security Disability Benefits and Supplemental Security Income ("SSI") benefits on November 3, 2009. (Administrative Transcript ("T.") 14, 64-65).  The applications were denied on March 25, 2010 (T. 66-71), and plaintiff requested a hearing (T. 80-81).  On December 8, 2010, plaintiff, represented by counsel, testified before Administrative Law Judge ("ALJ") Edward I. Pitts (T. 24-58), who kept the record open for two weeks to allow

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits.  *See* 20 C.F.R. §§ 404.630, 416.340.  There are various requirements for this written statement.  *Id.*  If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

plaintiff to submit additional medical evidence (T. 55-57).

The ALJ denied plaintiff's claim in a decision dated February 3, 2011. (T. 14-23). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on April 20, 2012. (T. 1-4).

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity. If he is not, the Commissioner
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work
> activities. If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has an

2

impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional capacity"); *Selian*, 708 F.3d at 418 & n.2.

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417 (quoting *Talavera v. Astrue*, 697 F.3d at 151; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.*

However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

In order to determine whether an ALJ's findings are supported by substantial evidence, the reviewing court must consider the whole record, examining the evidence from both sides, "'because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403-404 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support of the ALJ's decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citing *Williams*, *supra*).

## III.  <u>FACTS</u>

Plaintiff applied for disability due to depression and borderline personality disorder (T. 126) and also claims to suffer from, *inter alia*, post-traumatic stress syndrome ("PTSD"), anxiety, and insomnia (T. 46). On the alleged onset date of July 30, 2009, plaintiff was 20 years old. (T. 102). Plaintiff has an eighth-grade education. (T. 30). In May 2004, the plaintiff, as a teenager, was the victim of an abduction and repeated rapes. (T. 309, 336). From May 2005 through September 2009, she was gainfully employed with various companies as a cashier at fast food restaurants, a pet groomer, and a telemarketer/sales representative. (T. 31-35, 109-12, 116-18, 128, 146). She collected unemployment for parts of 2009 and 2010. (T. 35-36, 115).

Plaintiff counsel has summarized the medical evidence regarding plaintiff's periodic treatment for several overdoses of over-the counter medication and various mental health issues between September 2003 and late 2010. (Pl.'s Brf. at 2-8, Dkt.

No. 12).  Defense counsel has incorporated plaintiff's statement of facts, "with the exception of any inferences or conclusions set forth by plaintiff." (Def.'s Br. at 2, Dkt. No. 13).  The ALJ also discussed the medical evidence in his decision (T. 16-22), but "allocated limited evidentiary weight to medical opinions rendered prior to the alleged onset date of disability as they provide little probative evidence as to claimant's current functioning, and they do not meet the duration requirement of the Act" (T. 19).[2]

The court will not set forth here further details of the medical and other factual evidence, which are discussed extensively in plaintiff's brief and the ALJ's decision. Relevant aspects of the evidence in the record are discussed further below in the course of analyzing the issues disputed by the parties.

## IV.  **ALJ's DECISION**

The ALJ determined that plaintiff met her insured status requirement for purposes of her DIB application through December 31, 2014, and had not engaged in substantial gainful activity since her stated onset date of July 30, 2009.  (T. 16).  The ALJ found that plaintiff had two severe impairments:  depression and PTSD.  (T. 16-17).  He determined that the plaintiff's impairments, alone or in combination, did not meet or medically equal the severity of Listed Impairment 12.04 (Affective Disorder) or 12.06 (Anxiety Related Disorders).  (T. 17-18).  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06.

After "careful consideration of the entire record," the ALJ found that plaintiff

---

[2] The court finds that the ALJ did not err in discounting the medical evidence relating to plaintiff's mental health and cognitive limitations prior to July 30, 2009, given that plaintiff was able to maintain gainful employment between May 2005 and the onset date.

retained the physical RFC for the "full range of work at all exertional levels." (T. 18). The ALJ further determined that the plaintiff maintained the ability, on a sustained basis, to perform "simple, unskilled, entry-level work, which is defined as understanding, carrying out, and remembering simple instructions; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting." (T. 18-22). In making his RFC determination, the ALJ gave "great weight" to consulting/examining psychologist Kristen Barry, Ph. D., and "considerable weight" to State Agency medical consultant V. Reddy. The ALJ gave only "some weight" to the medical source statement of treating physician, David Kang, M.D., of the Brownell Center for Behavioral Health and "little evidentiary weight" to the opinion of Michelle Panutsos, plaintiff's former case manager at the Brownell Center. (T. 19-20). The ALJ further found that plaintiff's allegations of debilitating symptoms were inconsistent, *inter alia*, with her treatment history and her "reasonable" level of daily activities. (T. 20-22).

The ALJ concluded that the plaintiff could not perform her past relevant work as a pet groomer because that work was generally classified as "semi-skilled," which exceeded her RFC. (T. 22). Considering the Medical-Vocational Guidelines at step five in the sequential analysis, the ALJ determined that there were other jobs that existed in significant numbers in the national economy that the plaintiff could perform. (T. 22-23). The ALJ found that, because plaintiff's nonexertional mental limitation had little or no effect on the occupational base of unskilled work at all exertional levels, the testimony of a vocational expert was unnecessary. (T. 23). The ALJ concluded that claimant "has not been under a disability . . . from July 30, 2009, through the date of his decision." (T. 23).

6

## V.    ISSUES IN CONTENTION

Plaintiff makes the following arguments:

(1)     The ALJ erred when he failed to develop the record by not obtaining a medical source statement from plaintiff's treating family physician, Dr. Bailey, and not ordering a consultative intelligence examination.  (Pl.'s Brf. at 10-14).

(2)     The ALJ erred by failing to find that plaintiff's impairments did not meet or medically equal Listing 12.06 for anxiety related disorders.  (Pl.'s Brf. at 14-16).

(3)     The ALJ's residual functional capacity finding was unsupported by substantial evidence because he failed to give controlling weight to the opinion of  treating physician, Dr. Kang, or appropriate weight to the assessment of case manager Panutsos.  (Pl.'s Brf. at 16-21).

(4)     The ALJ's credibility finding with respect to plaintiff's subjective complaints about her symptoms and limitations was unsupported by substantial evidence.  (Pl.'s Brf. at 21-23).

(5)     The ALJ's step-five determination was unsupported by substantial evidence and the ALJ erred by failing to secure the testimony of a vocational expert.  (Pl.'s Brf. at 23-24).

Defendant argues that the ALJ adequately developed the record, that the Commissioner's various findings were supported by substantial evidence, and that the testimony of a vocational expert was not required at the hearing.  (Def.'s Brf. at 4-13). For the reasons set forth below, this court agrees with the defendant and recommends that the Commissioner's decision be affirmed.

## VI.    DISCUSSION

### A.    Development of the Record

Plaintiff argues that the ALJ failed to develop the record by not requesting a

source statement from plaintiff's primary care physician, Dr. Bailey, and by failing to request a consultative intelligence examination. The court finds that the ALJ appropriately provided plaintiff's counsel with an opportunity to supplement the medical record and that a source statement from Dr. Bailey was not necessary for the ALJ to make a determination about plaintiff's mental limitations. Furthermore, in the light of the medical and other evidence of record, the ALJ did not err by failing to order a consultative intelligence examination.

### 1.    Legal Standards

Given the remedial intent of the Social Security statute and the non-adversarial nature of benefits proceedings, an ALJ has an affirmative duty, even if the claimant is represented by counsel, to develop the medical record if it is incomplete. *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. §§ 404.1512(d), 416.912(d) ("We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports."). Furthermore, "[t]he duty of an ALJ to develop the record is 'particularly important' when obtaining information from a claimant's treating physician due to the 'treating physician' provisions in the regulations." *Dickson v. Astrue*, 1:06-CV-511 (NAM/GHL), 2008 WL 4287389, at *13 (N.D.N.Y. Sept.17, 2008) (citing *Devora v. Barnhart*, 205 F. Supp. 2d 164, 172 (S.D.N.Y.2002)).

In furtherance of the duty to develop the record, an ALJ may re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to determine disability, and additional information is needed to reach a

determination. 20 C.F.R. §§ 404.1512(e), 416.912(e).[3]  Although the ALJ must

attempt to fill in any "clear gaps" in the administrative record, "where there are no

obvious gaps . . . and where the ALJ already possesses a 'complete medical history,'"

the ALJ is under no obligation to seek additional information. *Rosa v. Callahan*, 168

F.3d 72, 79, n. 5 (2d Cir. 1999).

### 2.    Analysis

#### a.    Source Statement from Dr. Bailey

Dr. Gene Bailey was plaintiff's primary-care physician for at least six years.

Although he treated plaintiff for mental health issues during that time, his primary

focus was a variety of plaintiff's physical health issues.  (T. 233, 410).  During the

time period after plaintiff's alleged onset date, Dr. Bailey did consult with plaintiff

about mental health issues; he prescribed medication for plaintiff's depression and

anxiety, but noted that her mental health issues were being addressed by therapist

Jackie Berry and the Brownell Center for Behavioral Health.  (T. 412, 417-18, 421-23,

426-27).  The most recent record of a visit to Dr. Bailey, on September 15, 2010,

reported that plaintiff's panic disorder and depression were both "stable" on

medication.  (T. 426).  Dr. Bailey's notes indicate that plaintiff gave him paperwork

regarding her claim for disability based on her emotional state, and that the doctor

"completed her forms."  (T. 426-27; *see also* T. 418, 422 (records of earlier visits

---

[3] Effective March 26, 2012, the Commissioner amended these regulations to remove former paragraph (e) and the duty it imposed on ALJs to re-contact a disability claimant's treating physician under certain circumstances.  I applied the version of the regulations in effect when the ALJ adjudicated plaintiff's disability claim, pursuant to *Lowry v. Astrue*, 474 F. App'x 801, 804 n.2 (2d Cir. 2012) .

during which plaintiff said she was seeking SSI and requested a letter stating that she was disabled for her "psych issues")).

At the administrative hearing on December 8, 2010, plaintiff's lawyer stated that he expected to obtain a medical source statement from the Brownell Center and some additional hospital records in the near future. The ALJ stated that a medical source statement would seem "essential," and he kept the record open for two weeks to allow plaintiff's counsel to submit the referenced records and anything else he wished to submit. (T. 55-57). After the hearing, plaintiff's counsel did submit a medical source statement from Dr. Kang of the Brownell Center and some records from University Hospital. (T. 177-79). After a written reminder from the ALJ, plaintiff's counsel also submitted some records, which he referenced during the hearing, from Crouse Hospital. (T. 180-81). Plaintiff's counsel never asked for an opportunity to submit a source statement from Dr. Bailey, although the doctor's records suggest that he completed some forms relating to plaintiff's SSI disability proceedings that were never submitted to the ALJ.

The medical evidence of record includes the source statement from Dr. Kang; a report from consultative psychologist, Dr. Barry; records of various other mental health professionals who treated plaintiff; as well as the treatment records from Dr. Bailey, the most recent of which reflected his conclusion that plaintiff's mental health conditions were stable on medication. The court concludes that there was no gap in the medical evidence such that a formal source statement from Dr. Bailey was necessary for the ALJ to make a disability determination. In any event, by advising

plaintiff's counsel of the importance of a medical source statement from a doctor treating plaintiff's mental health issues and keeping the administrative record open for a reasonable time so that such a statement could be submitted, the ALJ more than met his legal obligation to develop the record in this case. *See, e.g.*, *Balles v. Astrue*, 3:11-CV-1386 (MAD), 2013 WL 252970, at *5 (N.D.N.Y. Jan. 23, 2013) ("courts have routinely held that an ALJ satisfies his duty to develop the record by leaving the record open for an ample amount of time for plaintiff to submit treatment records and/or a medical source statement") (citing, *inter alia*, *Martinez-Paulino v. Astrue*, 11 Civ. 5485, 2012 WL 3564140, at *14 (S.D.N.Y. Aug. 20, 2012)).[4]

## b. Consultative Intelligence Examination

A consultative examination is used to "try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [the ALJ] to make a determination or decision" on the claim. 20 C.F.R. §§ 404.1519a(b), 416.919a(b). It can be reversible error for an ALJ not to order a consultative examination when an examination is required for an informed decision. *Tankisi v. Commissioner of Social Sec.*, 12-1398-cv, 2013 WL 1296489, at *2 (2d Cir. Apr. 2, 2013). However, an ALJ

---

[4] *Cf. Stokes v. Astrue*. No. 7:10-CV-1129 (MAD), 2012 U.S. Dist. LEXIS 27016, at *28-33 (N.D.N.Y. Mar. 1, 2012), in which District Judge D'Agostino suggested that an "ALJ must request . . . a [medical source] statement [from a treating physician] regardless of whether the record contains a complete medical history." In this case, the ALJ advised plaintiff's counsel that a source statement from a physician treating plaintiff's mental health issues was essential, and the plaintiff ultimately submitted a source statement from one such treating physician, which adequately distinguishes *Stokes*. Moreover, the Second Circuit recently held that, on the facts of a particular case, including "a voluminous medical record assembled by the claimant's counsel that was adequate to permit an informed finding by the ALJ, . . . it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity." *Tankisi v. Commissioner of Social Sec.*, 12–1398–cv, 2013 WL 1296489, at *4 (2d Cir. Apr. 2, 2013).

is not required to order a consultative examination if the facts do not warrant or suggest the need for it. *Lefever v. Astrue*, 5:07-CV-622 (NAM/DEP), 2010 WL 3909487, at *7 (N.D.N.Y. Sept. 30, 2010), *aff'd*, 443 F. App'x 608 (2d Cir. 2011).

The medical evidence of record was sufficient for the ALJ to make his RFC determination. Dr. Barry, the consultative psychologist, estimated that plaintiff's intellectual functioning was in the borderline range, and her general fund of knowledge somewhat limited. However, Dr. Barry concluded that plaintiff's attention and concentration were grossly intact, and that she was able to follow and understand simple directions and instructions and should be able to perform simple tasks independently. (T. 333-34). *See, e.g.*, *Washington v. Astrue*, 5:12-CV-39 (GLS), 2012 WL 6044877, at *2-3 (N.D.N.Y. Dec. 5, 2012) (the ALJ did not err in failing to order a consultative intelligence examination, in part because the consultative psychologist reported that, despite the fact that plaintiff's intellectual functioning was in the borderline to low average range, she could follow and understand simple directions and instructions and maintain attention and concentration fairly well).

As in *Tankisi*, to the extent that the record supported a finding that this plaintiff faced cognitive limitations, those limitations were incorporated into the ALJ's RFC determination, that plaintiff could perform "simple, unskilled, entry-level work, which is defined as understanding, carrying out, and remembering simple instructions; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting." (T. 18-22). *See Tankisi v. Commissioner of Social Sec.*, 2013 WL 1296489, at *3 ("[t]he record does not suggest

any further limitation that would necessitate a consultative intelligence examination"). Moreover, notwithstanding plaintiff's possible innate cognitive limitations, she managed to maintain gainful employment, sometimes in a semi-skilled occupation, between May 2005 and September 2009. Accordingly, the court concludes that the ALJ had adequate information in the existing record to decide this case without a consultative intelligence examination of plaintiff.

### B.     Listing 12.06

Plaintiff argues that she meets the requirements of Listing 12.06 (Anxiety Related Disorders) because she suffers from "[r]ecurrent and intrusive recollections of a traumatic experience, which are a source of marked distress" and because she has marked difficulties in maintaining (1) social functioning and (2) concentration, persistence, or pace. This court finds that the plaintiff has failed to establish all of the necessary components of this listing, and that there was substantial evidence supporting the ALJ's finding that plaintiff did not meet this listed impairment.

### 1.     Legal Standards

To establish that plaintiff meets the criteria of Listing § 12.06 (A) and (B) for anxiety disorders, in the manner she claims, plaintiff must produce medically documented findings of at least one of the several paragraph "A" conditions, which include "[r]ecurrent and intrusive recollections of a traumatic experience, which are a source of marked distress" **and** which results in at least two of the following of the paragraph "B" criteria:

1.     Marked Restriction of activities of daily living; or

2.     Marked difficulties in maintaining social functioning; or

3.     Marked difficulties in maintaining concentration, persistence or pace; or

4.     Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06. A "marked" limitation means "more than moderate, but less than extreme"; one that "interferes seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C). "Repeated" episodes, *e.g.*, of decompensation, means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks" or "more frequent episodes of shorter duration or less frequent episodes of longer duration" which are determined, in an exercise of judgment, to be "of equal severity." *Id.,* § 12.00(C)(4).

### 2.    Analysis

This court will assume, without deciding, that the defendant's claims of panic attacks relating to her kidnaping and rape as a teenager, satisfy the § 12.06 (A)(5) condition, as her attorney argues. However, it is clear that counsel's proffered basis for establishing two of the paragraph B criteria do not sustain plaintiff's burden of proof at step three of the sequential analysis.

Relying on the consultative psychological evaluation of Dr. Barry and the mental RFC assessment of Dr. Reddy, the ALJ found that plaintiff did not satisfy the paragraph B criteria, because she had only mild restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in concentration, persistence, and pace; and one or two episodes of decompensation–less

than necessary to qualify as "repeated." (T. 17-18). The ALJ also set forth additional supporting evidence for this finding, which the court will discuss below in connection with the ALJ's RFC determination.

Plaintiff's counsel relied primarily on the medical source statement of Dr. Kang in arguing that plaintiff had marked limitations with respect to maintaining social functioning and concentration, persistence, or pace. (Pl.'s Brf. at 15). Using a five-category scale, Dr. Kang opined that plaintiff was "seriously limited, but not precluded" with respect to the following five of 21 abilities and aptitudes required to do unskilled work or particular types of jobs: (1) complete a normal workday and workweek without interruptions from psychologically based symptoms; (2) accept instructions and respond appropriately to criticism from supervisors; (3) deal with normal work stress; (4) maintain socially appropriate behavior; and (5) travel in unfamiliar place. (T. 431-32). The "seriously limited" category is in the middle of the five-category scale on the form used for Dr. Kang's source statement; it is defined on the form to mean that the ability to function in this area is "seriously limited and less than satisfactory, but not precluded in all circumstances." (T. 431).

The "seriously limited" category is less restrictive than the "unable to meet competitive standards" category,[5] which is defined on the form to mean that the patient "cannot satisfactorily perform this activity independently, appropriately,

---

[5] Dr. Kang found that plaintiff was "unable to meet competitive standards" with respect to use of public transportation. Plaintiff is able to drive and has access to a car (T. 44, 140), and the ability to use public transportation is not relevant to maintaining social functioning and concentration, persistence, or pace–the paragraph B criteria at issue.

effectively, and on a sustained basis in regular work."[6]  Notably, the quoted part of the definition for "unable to meet competitive standards" corresponds directly to the definition of a "marked" limitation in § 12.00(C) of the regulations, which applies to Listing 12.06.  Accordingly, Dr. Kang's use of the less restrictive "seriously limited" category for some of the abilities and aptitudes related to social functioning and maintaining concentration, persistence, or pace, does not correspond to a finding of "marked" limitations in these areas, as plaintiff's counsel argues.  Accordingly, plaintiff has not satisfied her burden of establishing that she meets the paragraph B criteria, as required to meet Listing 12.06 in the way that she claims.[7]

## C.    RFC/Treating Physician/Credibility

The ALJ found that plaintiff had the physical capacity to perform work at all exertional levels.  (T. 18).  The ALJ further determined that, notwithstanding her mental health issues, the plaintiff was able to perform "simple, unskilled, entry-level work.  (T. 18-22).  Plaintiff argues that the ALJ erred in performing his RFC analysis

---

[6] The most serious category on the form used by Dr. Kang is "no useful ability to function," which indicates that the patient "cannot perform this activity in a regular work setting."  Dr. Kang did not select this category for plaintiff with respect to any ability or aptitude.

[7] Plaintiff's counsel points to other answers or comments of Dr. Kang on his source statement, including that, "[d]ue to symptoms of [plaintiff's] PTSD and depression, attendance gets impacted and she has difficulty sleeping at night to meet work needs at this time."  (Pl.'s Brf. at 15; T. 431).  Dr. Kang also checked boxes on the form opining that, due to her impairments, limitations, and/or treatment, plaintiff would be "off task" (*i.e.*, "unable to maintain attention or perform at a consistent pace") 20% of the workday and would be absent from work more than four day per month.  (Pl.'s Brf. at 15; T. 432).  Even if these comments were construed to constitute Dr. Kang's conclusion that plaintiff's limitation with respect to maintaining concentration, persistence, or pace was "marked," this would satisfy only one of the four paragraph B criteria and still would not establish that plaintiff met Listing 12.06.  As discussed below, the ALJ did not err in according more weight to Dr. Barry's opinions than he did to Dr. Kang's opinion, which would also support the conclusion that plaintiff did not sustain her burden of proving that she met the requirements of Listing 12.06.

16

by failing to give controlling weight to the opinion of treating physician, Dr. Kang; by not giving any weight to the opinion of plaintiff's former mental health case manager; and by improperly assessing the credibility of plaintiff's claims about her mental health symptoms and limitations. (Pl.'s Brf. at 16-23). For the following reasons, this court concludes that the ALJ did not err in his RFC analysis, and that his determination is supported by substantial evidence.

### 1. Legal Standards

#### a. RFC

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Id.* (citing, *inter alia*, *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

### b. Treating Physician

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must properly analyze the reasons that the report is rejected. *Halloran v. Barnhart*, 362 F.3d at 32-33. An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### c. Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (citation omitted). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858 (RSP/GJD), 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce

the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.  20 C.F.R. §§ 404.1529(c), 416.929 (c).  When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

## 2.    Analysis

As noted above, the ALJ concluded that plaintiff could perform simple, unskilled, entry-level work–that is, she was capable of "understanding, carrying out, and remembering simple instructions; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting."  (T. 18).  In making this determination, the ALJ gave great weight to the opinion of consultative psychologist Kristen Barry, Ph. D., who performed a

"thorough" examination of plaintiff in March 2010. (T. 19). Dr. Barry concluded that, although claimant has difficulty handling stressors and making appropriate decisions, she "is able to follow and understand simple directions and instructions and . . . should be able to perform simple tasks independently." (T. 334). *See, e.g.*, *Netter v. Astrue*, 272 F. App'x 54, 55–56 (2d Cir. 2008) (reports of consultative and/or non-examining physicians may override opinions of treating physicians, provided they are supported by substantial evidence in the record).

The ALJ also relied on the mental RFC assessment performed by state agency medical consultant, Dr. Reddy, which was "well supported by a narrative rationale that references findings in the record (T. 357), and based on a thorough review of the medical evidence of record." (T. 19). *See Id.*; 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2) (ALJs must consider the findings of state agency medical consultants and other program physicians because they are highly qualified and are also experts in Social Security disability evaluations). Dr. Reddy found that plaintiff was no more than moderately limited in various mental RFC categories (as detailed below), and concluded that she "appears capable of the basic functional requirements of unskilled work in a low contact, low stress environment. (T. 352-53, 357).

Plaintiff's counsel argues that the ALJ erred in only giving "some weight" to the medical source statement of Dr. Kang, who oversaw the mental health treatment of plaintiff at the Brownell Center for Behavioral Health. (T. 430-33).[8] However, Dr.

---

[8] Therapist Sabrina Michalski apparently conducted plaintiff's weekly psychotherapy sessions and Scott Burnside managed her medications, although Dr. Kang was the approving doctor with respect to plaintiff's treatment at the Brownell Center. (T. 36, 385-86, 388).

Kang's stated findings are generally consistent with the opinions of Dr. Barry and Dr. Reddy regarding plaintiff's mental health limitations, as well as the ALJ's RFC determination that plaintiff could perform simple, unskilled work. Dr. Kang found that plaintiff was "Unlimited or Very Good" in remembering work-like procedures; understanding, remembering, and carrying out very short and simple instructions; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being unduly distracted; making simple work-related decisions; and performing at a consistent pace without unreasonable rest breaks. (T. 431). Dr. Kang concluded that plaintiff was "Limited but satisfactory" in maintaining attention for two hour segments, maintaining regular attendance and being punctual, asking simple questions, getting along with co-workers and peers, and responding appropriately to changes in a routine work setting. (T. 431).[9] Dr. Kang found that plaintiff was "Seriously limited, but not precluded" from completing a normal workday and workweek without interruptions from psychologically based symptoms, accepting instructions and responding appropriately to criticism, dealing with normal work stress, and maintaining socially appropriate behavior. (T. 431-32).[10]

---

[9] The mental RFC assessment form completed by Dr. Reddy uses different evaluative categories than the source statement form completed by Dr. Kang. Based in part on the consultative report of Dr. Barry, Dr. Reddy found that plaintiff was "Not Significantly Limited" in remembering locations and work-like procedures; understanding, remembering, and carrying out very short and simple instructions; performing activities within a schedule, maintaining regular attendance and punctuality; sustaining an ordinary routine without special supervision; asking simple questions or requesting assistance; getting along with co-workers and peers; and responding appropriately to changes in the work setting. (T. 352-53).

[10] As noted above, the "Seriously limited, but not precluded" category on Dr. Kang's medical source statement form corresponds to less than "marked," as that term is defined in the Social Security regulations. Dr. Reddy found that plaintiff had "moderate" limitations in two of

In 21 categories of "mental abilities and aptitudes needed to do unskilled work" or to do particular types of jobs, Dr. Kang found only one area in which plaintiff was found to be unable to meet competitive standards–using public transportation–which, as noted above, is not relevant with respect to plaintiff's RFC. Dr. Kang did not conclude that plaintiff had "No useful ability to function" in any area. (T. 431-32).[11]

The ALJ took issue with the finding in Dr. Kang's December 2010 source statement that claimant would be absent more than four times per month because of her mental impairments and treatment and Dr. Kang's somewhat ambiguous conclusion that plaintiff's "psychiatric condition limits her ability to work at this time" (T. 432). The ALJ stated that these findings/conclusions of Dr. Kang were not supported by limitations he identified in his assessment and were inconsistent with plaintiff's most recent counseling records, which documented improvement with treatment. (T. 20). Indeed, the other specific findings in Dr. Kang's source statement (discussed above) suggested a much more promising prognosis with respect to plaintiff's ability to perform simple, unskilled work. Moreover, the record of

the same categories for which Dr. Kang found that plaintiff had "Serious" limitations– completing a normal workday and workweek without interruptions from psychologically based symptoms, and accepting instructions and responding appropriately to criticism. (T. 352-53). Dr. Reddy's narrative, following the conclusion of Dr. Barry, found that plaintiff may have "difficulty" dealing with stress. (T. 334, 357, 431). Dr. Kang found plaintiff was seriously limited in maintaining socially appropriate behavior, while Dr. Reddy found that plaintiff was not significantly limited in this area. (T. 353, 432). On the other hand, Dr. Reddy found plaintiff was moderately limited in her ability to work in coordination and proximity to others without being distracted by them, while Dr. Kang rated plaintiff as unlimited or very good in this category. (T. 352, 431).

[11] Dr. Reddy did not find that plaintiff had any "marked" limitations in his mental RFC assessment. (T. 352-53).

plaintiff's most recent counseling sessions at the Brownell Center (in October 2010) documented that plaintiff was making "moderate progress" with her anxiety.  (T. 388, 390).  While plaintiff continued to struggle with depression, the June 2010 intake report noted that "the extent to which her [depressive] symptoms impair functioning is questionable."  (T. 390, 407).  As the ALJ noted (T.  21), plaintiff's primary care physician, Dr. Bailey, stated that, as of September 2010, her panic and depressive disorders were "stable" on current medications.  (T. 426).[12]

Dr. Kang's December 2010 source statement notes that plaintiff (by then, age 21) had been suffering from her mental health symptoms since her abduction and rape when she was 15 years old.  The ALJ observed that, during much of the time period after plaintiff's mental health issues started, the plaintiff was gainfully employed–from May 2005 through September 2009.  (T. 22, 31-35, 109-12, 116-18, 128, 146).  As discussed further below, the ALJ also noted that plaintiff maintained a reasonable level of activities of daily living, which is also inconsistent with Dr. Kang's conclusions, to the extent they suggest plaintiff's limitations due to her mental health symptoms would prevent her from performing simple, unskilled work.  (T. 21-22).

Plaintiff argues that the ALJ also erred in according "little evidentiary weight" to the opinion of Michelle Panutsos, who was plaintiff's case manager at the Brownell Center for eight months, until October 2010.  (Pl.'s Brf. at 19-21; T. 20, 429).  Ms.

---

[12] Plaintiff's counsel points to records of plaintiff's April 12, 2010 visit to Dr. Bailey, when he noted that a recent exacerbation of plaintiff's PTSD symptoms interfered with her sleep, leaving her "disabled . . . in that she cannot work without sleep."  (Pl.'s Brf. at 19; T. 418).  Dr. Bailey prescribed medication at that time, which had resulted in the stabilization of plaintiff's symptoms by her September 2010 appointment with Dr. Bailey.  (T. 426).

Panutsos opined that plaintiff still struggled with symptoms of anxiety, depression, PTSD, and insomnia which limit her ability to "function" during the day and creates "barriers" to her ability to work. (T. 429). The ALJ correctly noted that Ms. Panutsos, whose professional/medical qualifications are not set forth in the record, is **not** an "acceptable medical source" whose opinions may be entitled to controlling weight. (T. 20). *See* SSR 06-03P, 2006 WL 2329939, at *2, 5 ("The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because. . . 'acceptable medical sources' 'are the most qualified health care professionals.'"). The ALJ appropriately considered, but ultimately discounted Ms. Panutsos' opinions because they were inconsistent with plaintiff's broad activities of daily living and recent mental health records, as discussed elsewhere herein. (T. 20). *See Id.* at *2, 4 (evidence from "other" medical sources may be considered to show the severity of the individual's impairment(s) and how it affects the individual's ability to function and should be evaluated based on the same factors applied to "acceptable medical sources," including "[h]ow consistent the opinion is with other evidence").

In doing his RFC assessment, the ALJ applied the appropriate framework to evaluate the credibility of plaintiff's statements about her symptoms and limitations. (T. 20). The plaintiff claimed that she had trouble maintaining employment because of symptoms of depression and PTSD, including self-isolation, insomnia, flashbacks, and panic attacks. (T. 20, 46-47, 332). The ALJ concluded that, while there was some

evidence that plaintiff had mental limitations, her "allegations of debilitating symptoms [are] inconsistent with her treatment history" and other evidence in the record. (T. 21-22).

The ALJ noted that, in March 2010, Dr. Barry observed that, although plaintiff presented as "somewhat helpless and dysphoric" and "[a] little anxious," she was cooperative; her manner of relating and social skills were adequate; her hygiene and grooming were good; her eye contact was appropriate; her speech was fluent and clear and her expressive and receptive language skills were adequate; her thoughts were coherent and goal directed; and her attention, concentration, and memory were grossly intact. (T. 21, 332-33). Although plaintiff testified that her April 2010 overdose on over-the-counter medications was a "suicide attempt" (T. 37), at the time, she denied that she tried to kill herself or had suicidal ideation, intent, or plan (T. 444-45). The hospital records noted that plaintiff presented as "mildly depressed" but, as the ALJ observed, her mental status was "largely normal." (T. 21, 438-39). Plaintiff was referred to the Brownell Center, and the intake report in June 2010 reported that plaintiff displayed good grooming and hygiene, appropriate eye contact, fluent speech, logical and linear thinking, an appropriate affect, and unremarkable judgment, insight, and impulsivity. (T. 21, 406-07). As noted above, the therapist stated that, although plaintiff had depressive symptoms, "the extent to which symptoms impair functioning is questionable." (*Id*.). By September 2010, Dr. Bailey noted that plaintiff's depression and panic disorders were stable on current medication. (T. 21, 426).

As the ALJ observed, notwithstanding plaintiff's testimony that she "does little

throughout the day," the evidence of record indicates that plaintiff maintained a broad level of activities of daily living. (T. 20, 21-22, 41-44). As plaintiff admitted to treatment providers and in her adult function report, she lives by herself, drives, attends to her personal and hygiene needs, cares for a pet fish, prepares simple meals, cleans, does laundry, goes shopping, reads, attends a knitting class, watches television, and socializes, at least with her family. (T. 21-22, 41-44, 138-42, 377-78). At the time of the hearing, plaintiff admitted having boyfriends in the past, but not having a "serious" relationship since three-and-one half years ago. (T. 44). However, medical records reflect that plaintiff reported having a boyfriend with whom she was "sexually active" as recently as June 2010. (T. 407, 422).

As noted above, although plaintiff has had essentially the same mental health issues and symptoms since she was 15 years old, she managed to maintain gainful employment between 2005 and 2009. While plaintiff testified that she last worked in July 2009 (T. 35), she reported elsewhere that she continued to work until September 2009, after her alleged onset date. (T. 22, 146, 445). Plaintiff further stated that she lost her job as a telephone salesperson as a result of the poor economy, not because of any mental health symptoms. (T. 22, 445). Plaintiff collected unemployment benefits in late 2009 and 2010, essentially representing that she was ready, willing, and able to accept full-time employment during the period she was also claiming disability. (T. 22, 35-36,115). *See Deboer v. Astrue*, 5:11-CV-1359 (GLS), 2012 WL 6044847 at *4 (Dec. 5, 2012) ("an ALJ may consider evidence that the claimant received unemployment benefits and/or certified that she was ready, willing, and able to work

during the time period for which she claims disability benefits as one factor relevant to assessing her credibility") (collecting cases).

"It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir.1984); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (genuine conflicts in the medical evidence are for the Commissioner to resolve). This court concludes that the ALJ's RFC determination that the plaintiff could perform simple, unskilled work was supported by substantial evidence, including the opinions of Drs. Barry and Reddy and the evidence of plaintiff's considerable daily activities. To the limited extent that the conclusions of Dr. Kang suggested that the plaintiff could not perform simple, unskilled work, the ALJ appropriately concluded that the treating physician's conclusion was inconsistent with other substantial evidence in the record and should be accorded only "some weight." The ALJ also correctly determined that the plaintiff's claims of sustained and debilitating mental health symptoms and limitations that prevented her from performing simple work were not credible in light of the medical and other evidence.

### D.    The ALJ's Analysis at Step Five

The plaintiff argues that the ALJ erred in not utilizing a vocational expert in determining, at step five of the sequential analysis, that the plaintiff had the RFC to perform substantial gainful work in the national economy. The ALJ properly concluded that plaintiff's mental health limitations did not significantly diminish her

ability to perform simple, unskilled work and, thus, he did not err by failing to consult with a vocational expert.

### 1.    Legal Standards

Once the plaintiff shows that she cannot return to her previous work, the Commissioner bears the burden of establishing that the plaintiff retains the RFC to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Guidelines"). *Id.*

"If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert[,]" rather than relying solely on the Guidelines. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (*citing Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)). The mere existence of a nonexertional impairment does not automatically require consultation with a vocational expert nor preclude reliance on the Guidelines. *Bapp v. Bowen*, 802 F.2d at 603. The requirement for a vocational expert is triggered when a nonexertional impairment causes an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id*. at 605-06. The appropriateness of applying the Guidelines and the necessity for expert testimony must be determined on a case-by-base basis. *Id*. at 605.

## 2. Analysis

The ALJ's determined that the plaintiff maintained the RFC to perform simple, unskilled, entry-level work at all exertional levels. According, at step five, he appropriately examined whether plaintiff's mental impairments significantly diminished her capacity to meet the basic mental demands of competitive, remunerative, and unskilled work, as stated in Social Security Regulation 85–15. (T. 23). *Sipe v. Astrue*, 873 F. Supp. 2d 471, 480 (N.D.N.Y. 2012) (citing SSR 85-15, 1985 WL 56857). "These demands include the ability, on a sustained basis, to 'understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.' A substantial loss of ability to meet any of these demands would severely limit the potential occupational base." *Id.* (citing SSR 85-15, 1985 WL 56857, at *4).

The ALJ found that the plaintiff had solely nonexertional limitations which had little or no effect on the occupational base of unskilled work at all exertional levels; accordingly, the ALJ determined that the testimony of a vocational expert was unnecessary. He concluded that the plaintiff maintained the RFC to meet the basic mental demands of unskilled work and found that she was not disabled under the framework of Section 204.00 of the Guidelines. (T. 23).

Plaintiff argues that the plaintiff erred in not securing the advice of a vocational expert because the opinions of Drs. Kang, Barry, and Reddy indicate that plaintiff would be seriously limited in some of the aptitudes required to do unskilled work.

(Pl.'s Brf. at 23-24). However, this court finds there is substantial evidence supporting the ALJs finding that plaintiff's mental health impairments did not cause a substantial loss of ability to meet any of the demands of unskilled work–"to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 WL 56857, at *4.

As discussed above, Dr. Kang found that plaintiff was "Unlimited or Very Good" in understanding, remembering, and carrying out very short and simple instructions, and Dr. Reddy determined that plaintiff was "Not Significantly Limited" in these areas. (T. 352, 431). Dr. Kang concluded that plaintiff was "Limited but satisfactory" in responding appropriately to changes in a routine work setting and Dr. Reddy found that plaintiff was "Not Significantly Limited" in this ability. (T. 353, 431).

Dr. Reddy determined that plaintiff was "Not Significantly Limited" in sustaining an ordinary routine without special supervision and getting along with coworkers without distracting them or exhibiting extreme behaviors and "Moderately Limited" in working in proximity to others without being distracted by them and accepting instructions and responding appropriately to criticism from supervisors. (T. 352-53). Dr. Kang concluded that plaintiff was "Unlimited or Very Good" in sustaining an ordinary routine without special supervision and working in proximity to others without being distracted; "Limited but satisfactory" in getting along with co-workers without distracting them or exhibiting extreme behaviors; and "Seriously

limited, but not precluded" in completing a normal workday and workweek without interruption from psychologically based symptoms, accepting instructions and responding appropriately to criticism from supervisors, and dealing with normal work stress. (T. 431). Dr. Barry, and Dr. Kang also found that plaintiff may have "difficulty" dealing with stress. (T. 334, 357).

Social Security regulations have estimated that, at the unskilled level, there are approximately 2,500 sedentary, light and medium occupations, each representing numerous jobs in the national economy. SSR 85-15, 1985 WL 56857, at *1; *Cross v. Astrue*, 08-CV-862 (TJM), 2010 WL 2399379, at *14 n.18 (N.D.N.Y. May 24, 2010) (at least as recently as 1992, the Social Security Administration endorsed the view that the Guidelines reflected significant numbers of unskilled occupations). Unskilled work generally involves "dealing primarily with objects, rather than with data or people." SSR 85-15, 1985 WL 56857, at *4. Moderate limitations in a few of the abilities and aptitudes associated with unskilled work do not rise to the level of a "substantial loss" in the ability to perform the demands outlined in SSR 85–15. *Ellis v. Commissioner of Social Sec.*, 3:11-CV-1205 (GTS/ATB), 2012 WL 5464632, at *14 (N.D.N.Y. Sept. 7, 2012) (Report-Recommendation), adopted, 2012 WL 5464612 (N.D.N.Y. Nov. 8, 2012) (citing *Sipe v. Astrue*, 873 F. Supp. 2d at 481 (affirming ALJ's decision not to use a vocational expert when plaintiff was, *inter alia*, mildly or moderately limited in all the basic mental functions listed on the RFC form). *See also Buschle v. Astrue*, 5:10-CV-1535 (GLS), 2012 WL 463443, at *5 (N.D.N.Y. Feb. 13, 2012) (plaintiff's nonexertional impairments will not significantly limit the range of

work permitted by his exertional limitations despite his difficulties interacting with supervision and co-workers and his moderate impairment in responding appropriately to changes in a routine work setting).

Dr. Kang found that plaintiff was "seriously" limited in three of the 16 aptitudes necessary for unskilled work. However, as noted above, the ALJ took issue with Dr. Kang's opinion that plaintiff's impairments or treatment would substantially impair her ability to perform work on a sustained basis, and appropriately accorded only some weight to Dr. Kang's opinions. See *Cross v. Astrue*, 2010 WL 2399379, at *15 (upholding ALJ's determination that plaintiff's capacity for unskilled work was not significantly diminished and that a vocational expert need not testify notwithstanding the opinion of a treating nurse that the plaintiff was unable to meet competitive standards in responding appropriately to supervision and was seriously limited in her ability to respond appropriately to changes in the work setting, because the ALJ determined that the nurse's opinions were entitled to "very limited weight"); *McConnell v. Astrue*, 6:03-CV-521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (the ALJ may, at step five, rely on earlier decisions regarding the relative weight to be accorded to medical source opinions and the credibility of plaintiff's subjective statements regarding her limitations).

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file

written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: May 20, 2013

Hon. Andrew T. Baxter
U.S. Magistrate Judge